UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL ERIC SAUNDERS,                )
                          Plaintiff,        )
v.                                              )          No. 1:19-cv-782
                                                )
                                                )          Honorable Paul L. Maloney
CONSUMERS ENERGY COMPANY,      )
                          Defendant.        )
_____)

## BENCH TRIAL OPINION

This case arises out of a collision between Plaintiff Michael Saunders's sailboat's mast and an overhead powerline owned and constructed by Defendant Consumers Energy. Plaintiff sustained severe physical and mental injuries due to the collision, resulting in this lawsuit. The Court held a bench trial in this matter on May 16–20 and 26, 2022.

Pursuant to Fed. R. Civ. P. 52(a), and having considered the entire record and applicable law, the Court concludes that Consumers is liable to Plaintiff for damages arising out of its negligence and negligence per se. The Court's findings of fact and conclusions of law are set forth below in detail.

## I.        Findings of Fact

This section contains the Court's findings of fact on disputes raised by the parties during trial, as well as facts stipulated to by the parties. The Court adopts the parties' uncontroverted facts set forth in the final pretrial order (ECF No. 117 at PageID.2348-49), which are repeated in part in this section. Certain findings of fact are also provided in connection with the Court's legal analysis later in this opinion.

Plaintiff Michael Saunders is an avid sailor. He began learning how to sail from his grandfather at the mere age of seven, and he completed a boaters' safety course at age twelve. Plaintiff, who is in his early thirties, has been sailing most of his lifetime, and he testified that during the summertime, he spends most weekends sailing at various places in west Michigan. In fact, during the summers of 2016 and 2017, he lived onboard his sailboat with his girlfriend, R.G., and they "consistently sailed from Grand Haven all over southwest Michigan" (ECF No. 76-8 at PageID.1192).

On September 19, 2017, after Plaintiff had finished working around 6:00 or 7:00 p.m., he set sail[1] on his 1996 26-foot-long Kodiak Nimble Sailboat in Grand Haven, Michigan. Although the record is unclear as to exactly what time Plaintiff began sailing, he did so sometime around "dusk."[2] Plaintiff began his journey at a marina on the Grand River and started traveling upstream, around Dermo Island, away from Lake Michigan.[3]

As Plaintiff sailed southeast up the Grand River, he eventually reached one of the locations where the Grand River and "the Lost Channel" meet. The Lost Channel is a small tributary of the Grand River, and both of its ends meet the Grand River. In other words, the Lost Channel does not touch Lake Michigan or any other body of water other than the Grand

---

[1] During trial, Plaintiff testified that he was not "sailing," (or in other words, using wind to power his vessel) on September 19, 2017, even though he left his mast up. Rather, he was "motoring" the boat using the boat's motor. At the time he reached the Lost Channel, Plaintiff testified that his boat was in idle, which is the slowest speed a boat can travel while operating under motor power. For this opinion, the Court will use the terms "sailing" and "motoring" interchangeably, with the understanding that Plaintiff was using his vessel's motor to power the boat on September 19, 2017.

[2] The First Amended Complaint asserts that Plaintiff "was operating" his sailboat at 8:13 p.m. (ECF No. 21 at PageID.66). The exact time that he set sail is unclear.

[3] The Court will take judicial notice of the following facts: on September 19, 2017, in Grand Haven, Michigan, the sun set at 7:49 p.m., and twilight ended at 8:15 p.m. *See Sunrise Sunset*, https://sunrise-sunset.org/us/grand-haven-mi/2017/9 (last visited July 11, 2022); *see also* Fed. R. Evid. 201(b) (providing that a judicially noticed fact must be one "not subject to reasonable dispute" in that it is either "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources who accuracy cannot be reasonably questioned.").

River. The map below, published by the National Oceanic and Atmospheric Administration ("NOAA"), Chart 14933,[1] depicts the Lost Channel and where it connects to the Grand River (shown by the red circles added by this Court). Plaintiff entered the Lost Channel from the Grand River at the narrower entrance on the southeastern side of the channel.



The Lost Channel was not given this name until 1984. Until 1984, the Lost Channel was simply known as a part of the Grand River. The Grand River and the Lost Channel are navigable waterways of the United States because they are subject to the ebb and flow of the

---

[1] *See* ECF No. 68-4 at PageID.661. For the full chart, see *Grand Haven Including Spring Lake and Lower Grand River*, National Oceanic and Atmospheric Administration https://www.charts.noaa.gov/OnLineViewer/14933.shtml (last visited July 11, 2022).

tide, and they eventually flow into the ocean. They have been classified as such since at least 1870 when the United States Supreme Court held that the Grand River "must be regarded as a navigable waterway of the United States." *The Daniel Ball*, 77 U.S. 557, 563 (1870). By sitting in admiralty jurisdiction, this Court affirmed that the Grand River and the Lost Channel are indeed navigable waterways (*see* ECF No. 74), which means that the United States Army Corps. of Engineers ("the Corps") has jurisdiction over these waterways.

When Plaintiff entered the Lost Channel, he began traveling northwest. Although Plaintiff had never sailed in this part of the Lost Channel before, he had, in the past, sailed in the wider, more northwestern portion of the channel. He traveled the Lost Channel with the intention of scouting for ducks for the upcoming hunting season. Before making this trip, Plaintiff testified that he consulted the relevant NOAA charts, weather forecasts, DNR gaming maps, Google Earth, and individuals with local knowledge before determining that the Lost Channel was safe to sail. He and R.G. describe Plaintiff as a very "prudent" and "cautious" boater, and he previously testified that he performs his due diligence before sailing (ECF No. 76-8 at PageID.1193).

Because Plaintiff had never traveled in this particular part of the Lost Channel before, he was concerned about "deadheads," or stumps and other large debris in the water. He was also concerned with running his boat aground, considering NOAA Chart 14933 shows that the low water datum[5] for the southeastern part of the channel was one foot, while his sailboat

---

[5] Multiple witnesses testified about the numbers shown in the water on NOAA Chart 14933. These numbers indicate the low water datum—which is the average low water level at the time NOAA gathered the hydrographic data—not the actual depth of the water. *See also Tides and Currents*, NOAA https://tidesandcurrents.noaa.gov/datum-updates/igld/lowWaterDatum.html (last visited July 11, 2022) (defining the low water datum as "a surface so low that the water level will seldom fall below it").

had a keel depth of two feet, eleven inches. However, he testified that he had seen power boats with large motors exit the Lost Channel from the southeastern side, so he concluded it was deep enough for him to travel. Moreover, Plaintiff said that if he did run aground and become stuck, he would simply get out of the boat, free it, turn it around, and go back through the channel the way that he entered. Due to his concerns about deadheads, Plaintiff proceeded through the Lost Channel while shining his flashlight down toward the water to examine any potential debris or obstructions in the water.

Additionally, Chart 14933 depicted a small footbridge toward the southeast end of the channel, but Plaintiff testified that, based on the local knowledge of other individuals he consulted, he knew that the bridge was no longer in place. Thus, the bridge, although depicted on NOAA Chart 14933, was not a concern for Plaintiff. He also testified that he was aware of an overhead powerline identified on the chart. But he was not concerned about the power cable because he believed Chart 14933 indicated a clearance height of ninety feet. He also knew that large orange warning buoys and signs were present at the powerline over the Grand River. And based on his prior experience sailing in the Grand River, he had observed this power cable in the past and believed that it was indeed ninety feet high where it crosses the Grand River.

But Chart 14933 is, at best, ambiguous. On this chart, the overhead power cable is shown as a black dashed line. Where the line crosses the main river, the chart states "OVHD PWR CAB AUTH CL 90 FT," indicating a clearance height of ninety feet. But where the continuous power cable crosses the Lost Channel, the chart merely states "OVHD PWR CAB." A zoomed-in picture of Chart 14933 and the overhead power cable is shown below.



Because NOAA Chart 14933 does not indicate a clearance height of something other than ninety feet where it crosses the Lost Channel, Plaintiff believed that this entire, continuous powerline had a clearance height of ninety feet. Unfortunately for Plaintiff, where the powerline crosses the Lost Channel, its clearance height was actually about twenty-eight feet. The mast on Plaintiff's sailboat was thirty feet high.

Unbeknownst to Plaintiff, when he reached the powerline, his thirty-foot mast struck the twenty-eight-foot powerline, owned and operated by Defendant Consumers Energy Company ("Consumers" or "Consumers Energy"). Consumers installed this 46,000-volt powerline in 1940, pursuant to a permit issued by the Corps (the "1940 Permit"). Where the powerline crosses the Lost Channel, it consists of two wooden poles on each side of the channel. No buoys or warning signs were located anywhere around the powerline or in the Lost Channel. Upon the mast's contact with the powerline, Plaintiff noticed an "arc on the

helm," so he surveyed the boat. Plaintiff looked up at the mast with his flashlight and did not notice an obstruction, so he believed that there was a short in the vessel's electrical wiring. He then proceeded to reach for the key to turn off the motor.

Although Plaintiff is unsure whether he ever touched the key, upon reaching toward the key, he testified that "everything went white," he became really hot, and he was blown backward. After this white flash, Plaintiff became temporarily blinded. He testified that he could not see anything, he did not know if he was permanently blinded, or what had happened. Plaintiff then dove into the water, presumably from the heat of the electrical arc, where he believes he treaded water for about five minutes while he slowly regained his vision. When Plaintiff reached up to rub his forehead, he felt skin peel off, which is when he realized he was terribly injured.

After Plaintiff regained his vision, he climbed back onboard the vessel and attempted to extinguish flames that had started from the electrical arc. Plaintiff testified that flames never contacted his body. When Plaintiff realized that he would not be able to extinguish the flames, he jumped back into the water, abandoned the vessel, and trudged toward shore. He eventually found a public roadway where he flagged down a Good Samaritan who drove him to North Ottawa Community Hospital.

Once Plaintiff reached the hospital, he began to realize the extent of his injuries and pain as the shock started to wear off. Plaintiff had severe burns on his face, ears, hands, and arms (*see Trial Exhibits 5A, 5B, 5C, 5D, 5E, 5F*). At the hospital, police officers notified Plaintiff—and he learned for the first time—that he had struck an overhead powerline, which was what caused the electrical arc on his sailboat. Doctors at North Ottawa Community

Hospital treated Plaintiff for about a half hour, but his burns were too extensive, so he was transported by ambulance to Butterworth Hospital in Grand Rapids for specialized burn treatment.

After burn doctors at Butterworth treated Plaintiff, they recommended that instead of being admitted to the hospital, he come in for regular treatment. Due to the extent of Plaintiff's open wounds, he was more likely to contract an infection at the hospital than at home. Doctors then prescribed Plaintiff pain medication and Silvadine, a topical cream to treat burns and prevent infection, and they told him that he needed to change his bandages every four hours. R.G. then drove him back home.

While at home, Plaintiff and R.G. were responsible for changing Plaintiff's bandages. Plaintiff also needed help with simple tasks such as applying the topical treatment and showering; R.G. assisted him with many every-day tasks. At first, Plaintiff and R.G. adequately—the Court uses this term with a grain of salt—changed Plaintiff's bandages while Plaintiff was prescribed the Silvadine topical cream. When Plaintiff ran out of the Silvadine cream, his doctors at Butterworth prescribed him a different topical cream. The reason for the change in prescription is unclear.

Upon this change in prescription, the bandages began sticking to Plaintiff's arms, but Plaintiff still had to change his bandages every few hours. The pain that Plaintiff experienced while ripping sticky bandages off of his open wounds was unbearable. During trial, Plaintiff compared the pain to ripping his own skin off. Although R.G. had helped Plaintiff change his bandages while he was using the Silvadine cream, R.G. could not assist Plaintiff in changing his bandages after the change in prescription—there was nothing she could do to

prevent the pain. Plaintiff tried to remove his bandages in the shower to alleviate some of the adhesiveness of the bandages, but even that method failed to mitigate Plaintiff's pain from removing his newly formed skin. R.G. testified that during one instance in which Plaintiff was removing his bandages in the shower, she peeked in the bathroom to check on him. She observed Plaintiff on his knees on the shower floor trying to peel the bandages off. R.G. said that the amount of blood coming from the wounds was "concerning." Plaintiff could only bear removing his bandages in that manner six times. He was in so much pain that Plaintiff decided to get a second opinion from the University of Michigan Hospital ("U of M"), with the hopes of receiving a more manageable treatment plan.

The doctors at U of M provided Plaintiff with bandages that did not adhere to his skin. Plaintiff described this treatment as "lifesaving" because he could not continue ripping his skin off. The doctors also prescribed a different ointment, steroids, and created a new treatment plan. In October 2017, U of M doctors performed a skin graft procedure on Plaintiff's left hand and arm. They took the graft from his left upper thigh and placed it on his hand and arm. Although the procedure was successful, Plaintiff still suffers from scarring, sensitivity and pain around the graft, inflexibility of the graft, and other functionality issues due to the graft's higher likelihood of tearing compared to the rest of his skin. Today, by his own choice, Plaintiff still wears a compression glove while performing manual labor to protect the graft.

In addition to the severe physical injuries that Plaintiff suffered and continues to suffer from the boating accident, he also continues to experience emotional and mental injuries. Plaintiff testified that he has anxiety and depression from the accident, and at trial, reliving

the accident worsened his mental state. He said that he has panic attacks, has trouble focusing on work, and questions why he survived. The Court also sympathizes with Plaintiff due to the unfortunate death by suicide of his brother, which Plaintiff is clearly still grieving. Plaintiff partially blames himself for his brother's death because his family's attention focused on Plaintiff after the accident, rather than on his struggling brother. This grief has only worsened Plaintiff's emotional recovery from the accident.

The Court need not only rely on Plaintiff's testimony to find that he has struggled, and is still struggling, from the physical and emotional injuries caused by the boating accident. Dr. Joshua Badour, who treated Plaintiff at Butterworth, testified about the severity of Plaintiff's burns and concluded that he suffered superficial burns, partial thickness burns, and full thickness burns as a result of an electrical source.[6] Dr. Bradley Sewick testified that Plaintiff continues to suffer from multiple psychiatric issues as a result of the accident: depression, anxiety, restlessness, decreased concentration, and irritability, to name a few. Dr. Sewick also diagnosed Plaintiff with post traumatic stress disorder ("PTSD").

---

[6] The Court addresses the reasons why it disagrees with Consumers Energy's position that Plaintiff's injuries were mainly the result of flames, a thermal source. Specifically, Consumers Energy's position is that Plaintiff's physical injuries resulted from Plaintiff's choice to climb back on the boat and attempt to extinguish the flames, rather than from the initial electrical shock. To support this position, Consumers presented the testimony of Dr. Sridhar Natarajan, who never examined Plaintiff in-person, and who concluded that Plaintiff's burns were the result of a thermal source, not an electrical source. Consumers also presented the testimony of Dr. Raghuram Elluru, a plastic surgeon, who concluded the same. Although Dr. Elluru examined Plaintiff in-person, he did not do so until "a couple years" following the accident. The Court finds that the testimony of Dr. Badour, Plaintiff's treating physician at Butterworth immediately after the accident, is more credible. Dr. Badour testified that his injuries were consistent with, and numerous tests confirmed, the conclusion that Plaintiff's injuries resulted from an electrical source. Particularly compelling was Dr. Badour's testimony that for Plaintiff to sustain such severe burns from a thermal source, he would have had to stay in the flames for a significant period of time. He stated that "it wouldn't make sense" for a person to sit in flames and allow himself to suffer such severe burns. Moreover, Dr. Badour noted that he found no evidence of burnt nose hairs or smoke inhalation, which would have been characteristics consistent with burns from a thermal source. For these reasons, the Court believes that Plaintiff's burns were the result of the initial electrical arc caused by the collision of the sailboat's mast with the Lost Channel powerline.

10

The Court found R.G.'s testimony particularly compelling. R.G. witnessed firsthand the seriousness of Plaintiff's injuries. She helped Plaintiff recover from the immediate injuries from the boating accident, but maybe more importantly, she has witnessed the lingering injuries that Plaintiff still struggles with. R.G. testified that Plaintiff no longer bikes, fishes, exercises, or completes manual labor projects like he did prior to the accident. R.G. explained that they no longer go out to concerts, restaurants, or bars because Plaintiff is self-conscious of his skin, and he becomes uncomfortable when people ask about his skin graft after they notice the scarring. To summarize, and to quote R.G., Plaintiff no longer has the same "interest and zest" in doing activities as he did before the accident.

Immediately after the accident, Plaintiff had to take about two and a half months off from work. He returned to work sometime around November or December 2017 with limited duties. Plaintiff estimated that he lost about $15,000 in wages due to the accident. Plaintiff also had significant medical bills—albeit insurance covered much of his medical costs—as a result of the accident. The Court will thoroughly evaluate Plaintiff's economic and non-economic damages later in this opinion.

## II.    Pending Motions

### A.  Defendant's Motions for Judgment as a Matter of Law

At the close of Plaintiff's presentation of evidence, Consumers moved for a "directed verdict" on two issues: (1) that it is entitled to the "open and obvious" defense in relation to the negligence claim, and (2) that Plaintiff failed to present evidence to support any award of damages for medical bills or loss of wages.

Motions for a directed verdict or motions for judgment as a matter of law, evaluated under the same standard pursuant to Fed. R. Civ. P. 50, apply only in jury trials. *See Grant v. Shaw Grp., Inc.*, No. 3:08-CV-350, 2021 WL 124399, at *1 (E.D. Tenn. Jan. 17, 2012) ("[D]efendants' motions are not cognizable under Rule 50, as that rule pertains to when 'a party has been fully heard on an issue during a jury trial[,]' and not a bench trial."). However, the Court concludes that Consumers could have moved for a judgment on partial findings under Fed. R. Civ. P. 52(c). Accordingly, the Court will construe Defendants' motions as Rule 52(c) motions. Under this rule,

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

*Id.*

First, the Court will not grant judgment for Consumers Energy as to its argument that it is entitled to the open and obvious defense. This Court previously noted that admiralty law recognizes the defense of "open and obvious," meaning that there is no duty to warn of open and obvious dangers (ECF No. 81 at PageID.1488) (citing *Gemp v. United States*, 684 F.2d 404, 407-08 (6th Cir. 1982). However, this defense is typically applicable in cases involving open and obvious dangerous conditions surrounding dams, large ships, cruise ships, and pleasure boats. *See id.*; *Lancaster v. Carnival Corp.*, 85 F. Supp. 3d 1341, 1344-45 (S.D. Fla. 2015); *Schade v. Clausius*, 48 N.E.3d 707, 709 (Ill. App. Ct. 2016). Neither party nor the

Court located any admiralty case holding that the open and obvious defense applies to powerlines crossing waterways.

On the other hand, Michigan courts have recognized that "there is no duty to warn of known overhead powerlines." *Groncki v. Detroit Edison Co.*, 557 N.W.2d 289, 295 (Mich. 1996). Although Consumers believes it is entitled to the open and obvious defense based on this rule, this argument is defeated based on one word: "known." The Court finds that the powerline over the Lost Channel was not "known" by Plaintiff. Although he may have known of its mere existence, he certainly did not know of its low clearance height—a distinction that is extremely important. Further, the complete lack of buoys or warning signs supports the conclusion that Plaintiff did not "know" of the Lost Channel's clearance height. Had Plaintiff indeed "known" that the Lost Channel powerline only had a clearance height of twenty-eight feet, the Court is certain that Plaintiff would not have sailed down the Lost Channel in a sailboat with a thirty-foot mast.[7]

Because Plaintiff did not know of the clearance height of the Lost Channel's low-hanging powerline, the Court holds that the powerline was not a known, open and obvious danger, which would have alleviated Consumers of its duty to warn. Consumers did indeed have a duty to warn of the Lost Channel powerline and its twenty-eight-foot clearance; thus, Consumers Energy's motion for judgment on partial findings as to the open and obvious defense will be denied.

---

[7] Even after Plaintiff's sailboat mast contacted the powerline, he still did not know of the powerline. He testified that he learned his mast contacted the powerline when police notified him as such at North Ottawa Community Hospital.

Second, Consumers moved for a finding that Plaintiff is not entitled to any monetary damages for wage loss or medical bills. It argues that (1) Plaintiff failed to prove with certainty the amount of wages he lost due to the boating accident, and (2) that Plaintiff's insurance covered most of his medical bills, so he is not entitled to "double dip" and receive the cost of his medical bills in damages.

Although the Court will thoroughly explain its award of damages below, the Court notes why it will grant in part and deny in part Consumers Energy's motion as to Plaintiff's entitlement of economic damages. Consumers argues that Plaintiff failed to prove his past and future wage loss damages, and the Court agrees. While an exact calculation is not required, Plaintiff is required to prove, "with reasonable certainty," the amount of past and future wage loss. *See In re Delmarine, Inc.*, 520 F. Supp. 2d 422, 444 (E.D.N.Y. 2007). Plaintiff testified that, at the time of the accident, his salary was about $85,000 per year and he lost a portion of his wages for the two and a half months he was unable to work. He thus estimated that he lost about $15,000 in past wages due to the accident. However, Plaintiff provided no satisfactory evidence, such as pay stubs or tax returns, to document his salary or his assertion that he did not earn his full salary while he was recovering from the accident. Plaintiff's "off the cuff" estimate is insufficient. The Court finds that Plaintiff failed to prove his past lost wages with reasonable certainty. *See id.* at 444-45 (finding that not even the claimant's tax returns, admitted into evidence, could establish, with reasonable certainty, the claimant's damages for past lost wages). Moreover, he did not present any testimony as to future lost wages. Thus, Plaintiff is not entitled to recover any past or future lost wages.

14

Additionally, Consumers asks the Court to find that Plaintiff is not entitled to recover the cost of his medical expenses because they have already been paid by insurance. Consumers essentially argues that if Plaintiff were to recover the value of his medical bills in damages, he would be "double dipping." The Court is unpersuaded by this argument. Although the medical bills, provided as exhibits, indicate a balance of $0 due to insurance payments (*see* ECF Nos. 131, 133), the Court does not necessarily conclude that Plaintiff does not owe his insurance company any money, or that liens exist, should Plaintiff prevail in this lawsuit. As such, the Court will deny Defendant's motion for a judgment on partial findings as to the argument that Plaintiff is not entitled to recover any medical expenses.

### B. Plaintiff's Motion for Judgment as a Matter of Law

Plaintiff also moved for a judgment as a matter of law, arguing that *The Pennsylvania* rule must apply. Again, the Court will construe this motion as a Rule 52(c) motion for judgment on partial findings.

*The Pennsylvania* rule is a burden shifting rule in admiralty law. *See The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1873). Under this rule, if a plaintiff proves that a defendant violated a statute, then the burden shifts to the defendant to show that the violation of the statute could not have caused the maritime accident. *Id.* at 136. Although this rule originally applied only to ship collisions, it has been extended to encompass many types of marine accidents where a defendant committed a statutory or regulatory violation. *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991).

Plaintiff seeks the invocation of *The Pennsylvania* rule in regard to his negligence per se claim because he argues that Consumers violated the Rivers and Harbors Appropriation

Act of 1899, 33 U.S.C. § 403, which prohibits the creation of any obstruction over a navigable waterway of the United States absent receiving a permit from the Army Corps. For the reasons explained below in Section III.E, the Court finds that Consumers did indeed violate 33 U.S.C. § 403 when it constructed the twenty-eight-foot powerline over the Lost Channel. As such, Plaintiff's motion for judgment on partial findings—that *The Pennsylvania* rule is applicable to his negligence per se claim—will be granted.

## III.     Findings of Law

The Court incorporates its previous discussion regarding federal maritime law into this opinion (*see* ECF No. 81 at PageID.1486-87). For this matter, the Court is exercising its admiralty jurisdiction; it must apply federal maritime law and may adopt state law, consistent with established maritime law, in the event that maritime law on a particular issue does not exist. *See Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 50 (5th Cir. 1967).

### A. Negligence by Consumers Energy

Plaintiff first claims that Consumers was negligent in constructing, maintaining, and operating the twenty-eight-foot powerline over the Lost Channel (ECF No. 21 at PageID.68). The traditional elements of negligence are also applicable in admiralty cases:

> The elements of a maritime negligence cause of action are essentially the same as those for a land-based negligence action under common law: (1) the existence of a duty that requires a standard of care or conduct to protect against foreseeable risks, (2) a breach of that duty by conduct that falls below a reasonable norm, and (3) a reasonably close causal connection between the breach of duty and the resulting loss.

*Alprin v. City of Tacoma*, 159 P.3d 448, 451 (Wash. Ct. App. 2007); *see also Valentine v. United States*, 630 F. Supp. 1126, 1131-32 (S.D. Fla. 1986).

16

Further, pure comparative fault also applies in admiralty cases. *See United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411 (1975) ("We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault."). Therefore, even if a plaintiff is partially negligent—so long as he is not 100% negligent—he may still recover damages reduced in proportion to his percentage of negligence.

### 1. Duty and Breach

Throughout trial, Plaintiff presented several theories of liability in which he argued that Consumers breached a duty of care. Conversely, Defendant presented testimony that it complied with numerous duties of care. The Court will address each relevant standard of care below.

### a. NESC Standards

According to Johannes Laun, Plaintiff's electrical engineering expert, the National Electrical Safety Code ("NESC") "governs the installations, care, and general procedures for owners of electrical powerlines" (*see Expert Report of Johannes Laun*, ECF No. 134 at PageID.2550); *see also The NESC*, IEEE Standards Association, https://standards.ieee.org/products-programs/nesc/ (last visited June 28, 2022) ("[T]he National Electrical Safety Code (NESC) sets the ground rules and guidelines for practical safeguarding of utility workers and the public during the installation, operation, and

maintenance of electric supply, communication lines and associated equipment."). In other words, the NESC provides for generally accepted industry standards applicable to public utilities.

In maritime law, industry standards are not binding on the issue of negligence. Rather, a breach of industry standards is mere evidence of negligence. *See Schaeffer v. Michigan-Ohio Navigation Co.*, 416 F.2d 217, 222 (6th Cir. 1969) ("As to the industry safety standards, the District Judge properly instructed that the jury had a right to consider them in arriving at the verdict, but that they were not binding on the issue of negligence.") (collecting cases). Michigan law is consistent with this approach. *See Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 180 (Mich. 1993). In *Schultz*, the Michigan Supreme Court found that although Consumers Energy complied with the relevant NESC standards five-fold, custom and industry practices are merely relevant to the issue of due care; "they are not dispositive with respect to duty." *Id.* In accordance with this standard, the Court will merely use Consumers' compliance or lack of compliance with the NESC as evidence of due care—not necessarily to determine whether Consumers breached a duty.

There are several editions of the NESC—many of which are relevant to this matter. When Consumers constructed the Lost Channel powerline in 1940, it was required to comply with either the Fourth or Fifth edition of the NESC (*see Expert Report of Troy Little*, ECF No. 136 at PageID.2588). Although the Fourth and Fifth editions did not contain a specific standard regarding overhead clearance of powerlines over waterways, they did contain numerous other general standards. At trial, Mr. Laun testified that there is *no evidence* that Consumers complied with the relevant NESC standards at the time it installed

the powerline in 1940. Defendant's NESC expert, Mr. Troy Little, provided no evidence to the contrary. In fact, Mr. Little only analyzed whether Consumers complied with the 1961 and 2017 editions of the NESC. The Court acknowledges that this lack of evidence does not necessarily lead to the conclusion that Consumers failed to comply with the NESC in 1940, but a total lack of *any* information in Consumers' files on compliance with the NESC at the time of the powerline's installation is certainly peculiar.

In 1961, the Sixth Edition of the NESC was published. This edition also did not provide specific guidance to utilities when constructing powerlines over waterways. Instead, Rule 200(C) merely stated, "construction should be made according to accepted good practice for the given local conditions and all particulars not specified in the rules" (ECF No. 136 at PageID.2589). The record contains no evidence that Consumers attempted to comply with this rule. Mr. Little's expert report analyzes what the local conditions of the Lost Channel "would have" been in 1961, but he never concludes that Consumers actually consulted these local conditions or conducted any assessment of the Lost Channel from 1940 to 1961 (*Id.*).

The 1977 Seventh Edition of the NESC brought two important changes. First, the Seventh Edition added to Rule 232 express standards for powerlines constructed over waterways. Table 232-1 explains how a utility should calculate the overhead clearance of a powerline crossing a waterway (*see* ECF No. 134 at PageID.2551-52).

Second, the Seventh Edition of the NESC added the "Grandfather Clause," which grandfathered existing installations into compliance with the Seventh Edition, so long as they

19

complied with the previous edition of the NESC (which, at that time, would have been the 1961 Sixth Edition):

> Existing installations, including maintenance replacements, which comply with prior editions of this code need not be modified to comply with these rules except as may be required for safety reasons by the proper administrative authority. A replacement for a supporting structure, however, shall conform to the current edition of Rule 238C.

INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS INC., NATIONAL ELECTRICAL SAFETY CODE 105 (7th ed., 1977); (ECF No. 68-18 at PageID.780). Consumers argues that, due to the Grandfather Clause, so long as it complied with the 1961 Sixth Edition of the NESC, it needed not comply with any new standards following the Sixth Edition, including the new standards regarding powerlines over waterways added in the Seventh Edition.

The Court has serious doubts that, even with the establishment of the Grandfather Clause in 1977, Consumers was ever in compliance with the NESC from 1940 to at least 1977. Plaintiff presented the testimony of Mr. Laun, who opined that there is no evidence that Consumers complied with the NESC from the time of the powerline's installation through the publication of the Sixth Edition. Consumers failed to refute that assertion, and it failed to provide any documentation that it had even considered the NESC's standards from 1940 to 1977.

Given this complete lack of documentation, had Consumers acted as a reasonable and prudent utility company, it would have attempted to bring the Lost Channel powerline into compliance with the 1977 Seventh Edition of the NESC, which provided *specific* guidance for powerlines over waterways. Pursuant to these specific standards for powerlines crossing waterways, and a prudent utility company would have assessed all of its powerlines

over waterways to ensure their compliance with the new Rule 232, and in turn, to ensure the safety of the public. *See Schultz*, 506 N.W.2d at 457-58 (holding that a utility company's compliance with the NESC's clearance requirements five-fold did not relieve the utility of liability for injury).

Whether the Lost Channel powerline did indeed comply with the then-new clearance requirements contained in Rule 232 of the Seventh Edition of the NESC was an issue presented at trial. The parties presented contradictory conclusions as to this issue, but whether the powerline complied with the Seventh Edition rests on the determination of whether the Lost Channel was "suitable for sailing." Rule 232 of the Seventh Edition establishes different overhead clearance requirements for waterways "suitable for sailing" and for waterways "not suitable for sailing." Obviously, waterways that are suitable for sailing require higher overhead clearance to ensure that sailboats with tall masts can safely travel underneath powerlines.[8]

When a waterway is deemed suitable for sailing, the acreage of the waterway (including lakes, ponds, reservoirs, tidal waters, rivers, streams, and canals), the voltage of the powerline, and whether the powerline is insulated are all applicable in determining the

---

[8] The Court finds Mr. Laun's summation of the NESC's requirements for powerlines crossing waterways to be particularly informative:

> According to the NESC, electrical lines that cross water are subject to different height requirements based on voltage of the line and the nature of the water underneath the line. For navigable water ways, the required minimum height of the line is a function of the surface area of the water over which the line passes. For rivers and other such bodies of water, the area of the lake to which the river connects has influence as it is anticipated that boats that would use the lake or other body of water could use the river as access points, where the electrical lines are present. A public boat launch exists upstream on the Grand River to where this incident took place. The basis is to prevent accidental contact with the power line by any boat.

(ECF No. 134 at PageID.2550).

overhead clearance of a powerline (ECF No. 134 at PageID.2551) (showing Table 232-1 in the Seventh Edition of the NESC). For example, based on the characteristics of the Lost Channel and the powerline at issue, Mr. Laun determined that the powerline should have had a clearance height of 41.3 feet to comply with the Seventh Edition of the NESC because the Lost Channel is suitable for sailing (*see id.* at PageID.2553). Thus, Plaintiff argues that the Lost Channel powerline, which has a vertical clearance height of twenty-eight feet, failed to comply with the NESC at the time the Seventh Edition was published.

On the other hand, Mr. Little determined that the Lost Channel is not suitable for sailing (ECF No. 136 at PageID.2590). Thus, given the instructions from Rule 232 and Table 232-1, Mr. Little concluded that the Lost Channel powerline need only have a clearance height of slightly over 17 feet to comply with the Seventh Edition of the NESC (*Id.* at PageID.2591). Consumers therefore argues that its twenty-eight-foot-tall powerline was more than compliant with the Seventh Edition of the NESC.

The NESC itself does not clearly define "suitable for sailing." When the NESC is unclear, the public may submit interpretation requests to the NESC's Secretary for Interpretations. The interpretations committee will then review the request and publish a supplemental interpretation, which are commonly called "IRs." As for the ambiguity of the definition of "suitable for sailing," the NESC has published at least two relevant IRs: 308 and 367. IR 308 states,

> The NESC does not include criteria for determination of whether a water area is suitable for sailboating or for determination of the appropriate water height from which to measure the clearance. Areas which are not suitable for sailboating are so diverse in nature that these determinations are left to the

22

judgment and experience of the designer with respect to the conditions encountered.

Many of these areas are so tortuous, narrow, or rocky, or have such swift currents that they are unsuitable for maneuvering a sailboat. However, even though sailboats may not reasonably be anticipated in these areas, these areas may still be entirely suitable for a canoe, raft, or small boat during periods of appropriate water flow. While the use of some nonsailboating water areas may increase for canoeing, etcetera, during periods of high water, the use of others may be reduced because currents become too swift or turbulent. The appropriate level for measuring clearances will depend on the local conditions at the site.

(*Trial Exhibit HH*). And IR 367, in response to a hypothetical question regarding the suitability of sailing of a river with a low railroad bridge and a 23 kV overhead powerline, states,

Although there is a bridge that restricts passage of sailboats into the small body of water, there is no restriction to the passage of shallow-drafted sailboats from the bay into the river area that includes the line crossing. The crossing is considered to be over water suitable for sailboating.

(*Trial Exhibit 65*). Based on these IRs, it appears that the utility company should assess the conditions of the water, its surrounding area, and the potential for sailboaters to travel the waterway to determine whether a waterway is considered "suitable for sailing" under the NESC.

Mr. Laun personally inspected the location of Plaintiff's sailboating accident and the surrounding area of the Lost Channel (*see* ECF No. 134 at PageID.2552). He observed several boats using the Lost Channel, and he noted that no signs were posted restricting the use of the Lost Channel (*Id.* at PageID.2553). Moreover, his report further notes that a public boat launch exists upstream on the Grand River (*Id.* at PageID.2550). At trial, Mr. Laun reiterated these findings. He noted his observations of sailboats on the Grand River,

boat traffic on the Lost Channel, and the depth of the water, which was deep enough for sailboat and motorboat traffic. Mr. Laun testified that because sailboats can (and do) travel through the Lost Channel, it constitutes a waterway suitable for sailing according to the NESC. Thus, based on NESC requirements, he calculated that the recommended height for the Lost Channel powerline is 41.3 feet. Mr. Laun finally concluded that if the powerline's clearance was lower than 41.3 feet in 1977, it would not have been in compliance with the Seventh Edition of the NESC.

Consumers on the other hand, takes the position that the Lost Channel is not suitable for sailing. Based on the local conditions of the Lost Channel, such as its narrowness and shallow depth, Mr. Little testified that the Lost Channel is not sufficient to support sailing activities. Mr. Little's report reaches the same conclusion: "With a historic water depth of 1 foot and the narrowness of the channel, it is reasonable to not expect anyone to be sailing a boat in this area of the Lost Channel" (ECF No. 136 at PageID.2589). In accordance with NESC standards, because Mr. Little determined that the Lost Channel is not suitable for sailing, he calculated the recommended height for the Lost Channel powerline to be slightly over 17 feet (*Id.*).

The Court finds Mr. Laun's testimony, rationale, observations, and conclusions more compelling than Mr. Little's. While Mr. Little merely analyzed the depth and width of the Lost Channel, Mr. Laun personally visited the channel to observe boat traffic, characteristics of the water, topography of the surrounding area, the channel's relationship to the Grand River, and the width and depth of the channel. Although Mr. Little noted that the Lost Channel has a "historic water depth of 1 foot," Mr. Laun personally observed that the

channel was deeper than one foot. And the Court finds this conclusion to be true, given that Plaintiff sailed his boat with a two-foot, eleven-inch draft through the channel, and he observed numerous boats with large motors travel through the channel. The Lost Channel may have had a depth of one foot at one point in history, but it defies logic to find that its depth was that shallow at the time of Plaintiff's accident.

Moreover, the Court is not persuaded that the Lost Channel is too narrow for sailing. Although the exact width of the channel is unclear, Mr. Robert Taylor, a defense expert in naval architecture and marine engineering, testified that the narrow end of the Lost Channel is a little over two times the length of Plaintiff's twenty-six-foot-long sailboat, but toward the northwest end of the channel, it is much wider. But even assuming that the narrowest portion of the Lost Channel is about fifty-two feet wide, the Court finds this width to be plenty wide enough for sailboat traffic. Plaintiff even testified that if his boat ran aground, he would simply turn the boat around and proceed back in the direction that he entered the channel. Such a scenario would certainly be possible if the width of the Lost Channel was over two times the length of Plaintiff's boat.

Finally, the fact that there is a public boat launch and marina at the northwest mouth of the Lost Channel undermines any conclusion that it is "unreasonable" to expect sailboat or boat traffic on the channel. Both ends of the Lost Channel connect to the Grand River, which individuals quite frequently sail along. It is more than reasonable to expect sailboaters from the Grand River to venture through the Lost Channel, considering they would eventually exit the channel back into the Grand River. The Court finds that Consumers

should have anticipated sailboat traffic through the Lost Channel and underneath its powerline.

Reading IRs 308 and 367 together, a waterway is "suitable for sailing" if there are no restrictions or obstructions preventing a sailboat from sailing down the waterway, and it is not rocky, narrow, swift, tortuous, or exhibits other dangerous conditions. No witness testified that the Lost Channel is swift, tortuous, or rocky. Although two of Consumers Energy's witnesses testified that the channel is too narrow for sailing, as explained above, the Court disagrees. There are no signs restricting boat traffic, and there are no obstructions or hazards—other than the powerline—preventing a sailboater from traveling through the Lost Channel.

Pursuant to witness testimony and their interpretations of the Seventh Edition of the NESC, the Court finds that the Lost Channel was indeed suitable for sailing. As such, the NESC required Consumers to operate the powerline at a vertical clearance of at least forty feet (ECF No. 134 at PageID.2551). Because the Lost Channel powerline only had a vertical clearance height of twenty-eight feet, the Court finds that Consumers was in violation of the 1977 Seventh Edition of the NESC, and it has been in violation of the NESC up until Plaintiff's collision with the powerline.[9]

Although a violation of an industry standard is not dispositive as to the issue of negligence in an admiralty case, such a violation is evidence of failing to exercise due care or

---

[9] Mr. Laun testified that the 2017 edition of the NESC, applicable at the time of Plaintiff's accident, is "predominantly the same" as it was in 1977. Thus, if Consumers was in violation of the 1977 edition, it was also in violation of the 2017 edition.

26

a breach of a duty. The Court finds Consumers Energy's failure to comply with the NESC to be evidence of a breach of a standard of care, owed by a reasonable utility, to the public.[10]

### b. Internal Standards

Similar to industry standards, in maritime law, a breach of a company's internal standards is not decisive as to the issue of negligence, but "it is relevant to the analysis of legal issues relating to the determination." *In re City of N.Y.*, 475 F. Supp. 2d 235, 240 (E.D.N.Y. 2007). In other words, when a company or entity has a duty to exercise due care, its "internal rules are relevant to determining what constitutes due care." *Id.* (citing *de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1311 (2d Cir. 2002). Thus, while not dispositive as to the issue of negligence, a violation of internal rules is evidence of negligence. *Id.* (quoting *Danbois v. N.Y. Cent. R.R. Co.*, 189 N.E.2d 468, 471 (N.Y. 1963) ("[T]he violation of internal rules 'is not negligence in itself but under certain circumstances may be regarded by the trier of fact as some evidence of negligence.'")).

Two of Consumers' internal policies are relevant in this matter: (1) Subtransmission Line Construction Standards, Aerial Markering and Lighting (*Trial Exhibit 58*), and (2) HVD Line Construction Standards (*Trial Exhibit 59*).[11] At trial, Mr. Peter Mulhearn, a design

---

[10] Alternatively, the Court finds that Consumers also failed to comply with the NESC's requirement that utility companies must adhere to the requirements of permits issued by the Corps. As discussed below in Section III.E, the Court finds that Consumers failed to comply with the 1940 Permit, requiring the Grand River powerline, which includes the Lost Channel, to have a vertical clearance of at least eighty feet. Mr. Laun and Mr. Mulhearn both testified that when the Corps has issued a crossing permit over a navigable waterway, the permit's standards govern. In such a scenario, when a utility company fails to comply with the Corps' permit requirements, it also necessarily fails to comply with the NESC. Here, Consumers failed to comply with the 1940 Permit, and that failure establishes another way in which Consumers violated the NESC.

[11] To clarify the record, the Court acknowledges that it originally reserved on admitting Plaintiff's Exhibit 59 due to Defendant's objection that internal policies cannot be used to establish a legal duty in a negligence claim. However, Plaintiff provided admiralty case law showing that in maritime law cases, internal policies are admissible in determining what constitutes due care. Thus, the Court stated on the record at trial that it would admit evidence regarding Defendant's internal policies, which is why both Exhibits 58 and 59 have been admitted and received by the Court.

engineer at Consumers, testified that he approved these policies; an assertion that is corroborated by the documents listing "PA Mulhearn" as the approver. The HVD Line Construction Standards mirrors Rule 232 of the NESC standards regarding vertical clearance over waterways, and these standards were adopted in November 2013. The Aerial Markering and Lighting Standards require Consumers to place markers, lighting, and other warning signals around certain utility structures to warn the public of the structures' presence. Plaintiff argues that Consumers violated both of these internal policies by failing to adhere to its own clearance and warning policies.

The Court agrees with Plaintiff. Looking first at the Aerial Markering and Lighting policy, Consumers is required to install "marking and/or lighting" around powerlines over navigable waterways requiring a waterway crossing permit (*see Trial Exhibit 58*). This policy further contains certain shape, size, color, conspicuity, and type requirements for the markings. It is undisputed that Consumers failed to provide any warning signs or signals around the Lost Channel powerline. The powerline is completely absent of buoys, signs, or lights that would warn a boater of the presence of an overhead powerline. Consumers Energy's failure to place *any warnings* around the powerline appears to be a clear breach of its internal policy requiring marking and lighting around structures such as the Lost Channel powerline.

Turning to the HVD Line Construction Standards policy, it appears to mirror the NESC standards for vertical clearance over waterways. The following diagram is depicted on the policy document:



(*Trial Exhibit 59*). Given that the Lost Channel is a part of the Grand River, which empties

into Lake Michigan, the clearance heights for bodies of water with an area surface of 2,000

acres or more applies. And because the Lost Channel powerline was a 46 kV powerline, the

29

recommended vertical clearance of the line according to this internal policy is at least 40.8 feet. Therefore, the twenty-eight-foot-tall powerline appears to also be in violation of this internal policy.

At trial, Mr. Mulhearn testified that because Consumers enacted both of these internal policies after the date of the Lost Channel powerline's installation, the Lost Channel powerline need not comply with these policies. He stated that when Consumers enacts internal policies, they do not apply retroactively. Yet, neither of these policies state that they are only prospective or that they do not apply retroactively.

Even assuming Consumers only enacts prospective internal policies, the Court finds that a reasonable and prudent utility company would have assessed its structures that would have been governed under the newly enacted internal policies, had the internal policies predated the relevant structures. *See In re City of N.Y.*, 475 F. Supp. 2d at 240 ("A rational company . . . will be far more concerned with actually preventing accidents than with gaming future negligence actions by carefully crafting its safety manual."). The Court further finds that failure to enact retroactive policies is in itself evidence of some negligence. Consumers enacted these internal policies for a reason: safety. This case exemplifies just one tragic scenario that can occur in the absence of complying with safety policies and regulations. Accordingly, the Court finds that Consumers Energy's failure to even consider conforming the Lost Channel powerline to Consumers' internal policies is also evidence of a breach of due care.

### c. Pole Replacement

In 1988, Consumers replaced one of the Lost Channel powerline's poles. Even after this replacement, there is no evidence that Consumers reevaluated the clearance height of the powerline, determined whether the powerline complied with internal or industry standards, or made any assessment as to the safety of the powerline. The Court finds Consumers Energy's lack of action to be problematic. When Consumers replaced one of the poles, if it had acted as a reasonable utility, it would have recognized the low clearance height and lack of warnings and taken some action, however minimal, to remedy the dangerousness of the powerline. Instead, Consumers did nothing.

Moreover, the 1988 pole replacement should have triggered Consumers to notice the powerline's noncompliance with the NESC. Consumers takes the position that it has always been in compliance with the NESC due to the Grandfather Clause and being grandfathered into the standards under the 1961 Sixth Edition. Although the Court has already stated its conclusion to the contrary, let's assume *arguendo* that Consumers was indeed in compliance with the Sixth Edition of the NESC, and thus, it was grandfathered into compliance with the Seventh Edition. However, when Consumers replaced one of the powerline's poles in 1988, it was no longer grandfathered into compliance with previous editions of the NESC. The Grandfather Clause contains—and did contain at the time of the pole replacement—a provision that requires replacements for "supporting structures" to conform to the current edition of the NESC (*see* ECF No. 68-18 at PageID.781). The powerline's wooden poles are certainly "supporting structures." Therefore, the replacement of the pole triggered the need for Consumers to bring the powerline into compliance with Rule 232, which established

31

specific clearance requirements for powerlines over waterways. And because Consumers failed to raise the clearance height of the twenty-eight-foot powerline over a waterway suitable for sailing, subsequent to the pole replacement, Consumers would not have been in compliance with the NESC. Thus, even if Consumers was grandfathered into compliance with the 1977 and 1987 editions of the NESC, its compliance vanished with the replacement of the pole in 1988.

### d.  Failure to Warn

Under Michigan law, utility companies owe a general duty to warn of powerlines if there is a "likelihood or reasonable probability of human contact with the wires by persons who had a right to be in a place from which such contact was possible." *Clumfoot v. St. Clair Tunnel Co.*, 190 N.W. 759, 860 (Mich. 1922); *see also Hobbs v. Detroit Edison Co.*, 202 N.W.2d 431, 434 (Mich. Ct. App. 1972) (holding that where an electric utility company could anticipate human contact with underground wires, "[s]ome precaution or warning was necessary."). Under admiralty law, "there is an initial presumption of fault against a party who places an obstruction in a navigable waterway, and that party bears the burden of proving that it adequately warned of the danger such that it did not breach its duty of care." *Alprin*, 159 P.3d at 452 (citing *Casement v. Brown*, 148 U.S. 615, 626 (1893)); *see also Liner v. Dravo Basic Materials Co.*, 162 F. Supp. 499, 506 (E.D. La. 2001) (holding that the defendant adequately warned the public of a sunken barge by "placing a buoy at the site, issuing a notice to mariners, and marking the hazard on NOAA charts.").

32

Consumers totally failed to warn the public of the Lost Channel powerline. It is undisputed, and numerous pictures[12] corroborate, that *no* warning signs existed at the Lost Channel powerline. Plaintiff testified that where this powerline crosses the Grand River, there are reflective orange buoys near the powerline, indicating the presence of a dangerous obstruction. If Consumers could place warning buoys by the powerline where it had a vertical clearance of ninety feet, it certainty should have placed warning buoys by the powerline where it had a vertical clearance of only twenty-eight feet. Plaintiff also testified that most hazards in waterways, such as bridges and debris, have some type of warning signal around them. Here, Consumers completely failed to provide any type of warning signal to alert boaters of the presence of the low-hanging Lost Channel powerline.

The only justification that Consumers provided for its utter lack of warning signals by the powerline was that NOAA Chart 14933 sufficiently warned Plaintiff of the presence of a powerline over the Lost Channel. Consumers argues that it did not breach any duty owed to Plaintiff because the mere presence of the Lost Channel powerline on Chart 14933 satisfied its duty to warn. The Court previously addressed this issue in its order denying the parties' motions for summary judgment, and at that time, a general dispute of material fact existed as to how Chart 14933 is properly interpreted:

> There is no dispute that Plaintiff consulted the NOAA charts before he sailed down the Lost Channel. There is also no dispute that the charts list the clearance over the Grand River powerline as ninety feet, and that where the powerline crosses the Lost Channel, the charts state "OVHD PWR CAB" (*see NOAA Chart*, ECF No. 68 at PageID.595). However, there is a dispute as to whether the chart's height clearance indication of ninety feet over the Grand River also applies to the clearance over the Lost Channel. There are two ways to interpret the relevant NOAA charts: (1) the charts list a clearance of ninety

---

[12] *Trial Exhibits O, P.*

feet over the entire powerline, including the portion that crosses the Lost Channel, or (2) the charts fail to list a clearance over the Lost Channel. Plaintiff argues that he read the charts according to the first interpretation, while Consumers argues that it read the charts according to the second interpretation. Thus, there is a genuine dispute of material fact as to how the charts are properly interpreted, and whether they did adequately warn Plaintiff of the powerline.

(ECF No. 81 at PageID.1492).

At trial, Plaintiff's expert in marine safety and marine engineering, Marjorie Cooke, testified regarding Chart 14933. She stated that because the black dashed line representing the powerline is continuous over the Grand River and Lost Channel, even though Chart 14933 does not depict a clearance height at the location where the powerline crosses the Lost Channel, the proper way to interpret (and how one would expect an experienced boater to interpret) Chart 14933 is to conclude that the entire powerline has a clearance height of ninety feet. On the other hand, Mr. Taylor testified that because there are two "TR" symbols, which means "tower," on either side of the Grand River, the ninety-foot clearance symbol is intended to only encompass the powerline in between the two TR symbols. Thus, in Mr. Taylor's opinion, Chart 14933 does not show a vertical clearance where the powerline crosses the Lost Channel.

Despite both experts' interpretations of Chart 14933 in regard to the indicated clearance of the powerline over the Lost Channel, the Court finds that the chart is entirely ambiguous. It is reasonable to interpret Chart 14933 as showing the Lost Channel powerline's vertical clearance as ninety feet, and it is also reasonable to interpret Chart 14933 as failing to show a clearance in that location whatsoever. Given this ambiguity, Consumers is incorrect that it is absolved of its duty to warn Plaintiff of the powerline merely by the

34

presence of the powerline on Chart 14933. Although *accurate* NOAA charts may sufficiently warn a boater of the presence of a hazard, the Court is not inclined to hold that Chart 14933 is accurate. *See Liner*, 162 F. Supp. 2d at 506 ("The Government's duty to warn of a navigational hazard is satisfied by *accurately* noting the hazard on the appropriate navigational chart.") (emphasis added). Rather, it is plainly ambiguous.

In sum, the Court holds that Consumers breached its duty to warn, as well as duties it owed to Plaintiff pursuant to the NESC and Consumers' internal standards of care.

## 2.  Causation

It is undisputed that the collision of Plaintiff's sailboat mast with the Lost Channel powerline began a chain of events that caused Plaintiff's physical and mental injuries. However, at trial, Consumers argued that even if it committed an act of negligence, its negligence was not the proximate cause of Plaintiff's injuries. It argues that (1) Plaintiff was an intervening and superseding cause, relieving Consumers of any liability, and (2) that Consumers Energy's conduct was not a substantial factor contributing to Plaintiff's injuries.

Federal maritime law recognizes the doctrine of intervening and superseding causes. *See Exxon Co. U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 832 (1996) (affirming that the requirement of proximate causation and the related "superseding cause" doctrine apply in admiralty cases). However, it is well-settled that maritime law has also adopted a pure comparative fault standard. *See Reliable Transfer*, 421 U.S. at 411. Thus, in admiralty cases, even if a plaintiff is a proximate cause of his injuries, he is not necessarily barred from recovering damages from the defendant. So long as a plaintiff's own conduct did not 100% contribute to his injuries—which would classify him as an intervening and superseding cause—

then the plaintiff's damages will merely be reduced in proportion to his percentage of negligence. *See Exxon*, 517 U.S. at 840 (holding that a plaintiff in admiralty "that is the superseding and thus the sole proximate cause of his own injury" cannot recover part of his damages from tortfeasors who were causes in fact of the plaintiff's injury).[13]

Consumers argues that Plaintiff's conduct was "unforeseeable and extraordinary," classifying him as an intervening and superseding cause, and preventing Plaintiff from recovering any damages (*see* ECF No. 121 at PageID.2458). Consumers asserts that Plaintiff's damages were not foreseeable because the Lost Channel powerline existed for seventy-seven years without incident, and because the powerline was (ambiguously) identified on NOAA Chart 14933, boaters were notified of the powerline's presence. The Court is not persuaded by these arguments. For reasons already articulated in this opinion, it was perfectly foreseeable for Consumers to predict that a sailboat with a mast taller than twenty-eight feet would sail down the Lost Channel. Given the high volume of sailboat traffic on the Grand River, Consumer should have foreseen that sailboats may travel down the Lost Channel, which the Court reiterates is connected to the Grand River at both ends of the channel, while sailing in the Grand River.

---

[13] The Court notes it recitation of *Exxon* for the purpose of identifying an example of an intervening and superseding cause in an admiralty case:

> In *Exxon*, a tanker broke away from a mooring system for two hours and forty-one minutes. [*Exxon*, 517 U.S. at 830]. After the captain successfully maneuvered the ship to a safe position subsequent to the breakout, he then decided to operate the ship without consulting any navigational charts despite not knowing his position, and eventually ran the ship aground resulting in its constructive total loss. *Id.* at 834. During the breakout, the captain's actions were "grossly and extraordinarily negligent" enough to constitute an intervening and superseding cause, relieving the mooring system's manufacturer of liability. *Id.*

(*Opinion and Order Denying Motions for Summary Judgment*, ECF No. 81 at PageID.1495).

As for whether Plaintiff's conduct was "extraordinary," the Court is also not convinced. Consumers argues that "Plaintiff's misreading of the NOAA chart, along with his dangerous decision to proceed into the channel at dusk—with his mast up, flashlight in hand, and attention focused only on the water—was sufficiently negligent to form a superseding cause" (*Id.* at PageID.2460). While these acts could certainly constitute negligent acts, they are not so extraordinary to consider Plaintiff an intervening and superseding cause. Although Consumers paints a picture of obliviousness and carelessness by Plaintiff, the Court disagrees. First, Plaintiff did not "misread" the NOAA chart—it was ambiguous. Plaintiff interpreted the chart in one of two reasonable ways. Second, although Plaintiff may have been sailing at "dusk," Consumers has provided no evidence that it was dark at the time of Plaintiff's collision. Although Deputy Peter Hewett testified that it was dark by the time he reached the scene of the accident sometime after 9:00 p.m., both parties maintain the position that the accident occurred at "dusk," meaning there was still some daylight. *See supra* note 3. Third, multiple witnesses—including Mr. Taylor—testified that boaters only take their masts down when they trailer the boat. It is standard practice to keep a sailboat's mast up while operating the vessel, even if the vessel is operating under power. The Court does not find Plaintiff's decision to proceed down the Lost Channel with his mast up to be a negligent act. And finally, although Plaintiff's decision to focus only on the water ahead of him, resulting in his failure to observe all of his surroundings, constitutes some measure of negligence, this conduct is certainly not a superseding cause.

At trial, Consumers argued that Plaintiff's decision to return to the burning boat after he had jumped off following the initial electrical flash also constitutes an intervening and

superseding cause. Consumers asserted that Plaintiff's physical injuries were caused by a thermal source—the flames on the burning boat—rather than the initial electrical flash. For the reasons articulated in Footnote 6 of this opinion, the Court disagrees. Even if some of Plaintiff's physical injuries were caused by flames, the Court finds that the majority of his physical injuries were caused by the initial electrical flash. Therefore, Plaintiff's decision to return to the boat was not an independent act that superseded Consumers Energy's substantial contribution to Plaintiff's damages. *See Exxon*, 517 U.S. at 837 (The doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable.").

Finally, Consumers argues that it was not a proximate cause of Plaintiff's injuries because its conduct did not substantially contribute to Plaintiff's damages. Consumers cites numerous Michigan cases in support of this argument, but they are unpersuasive in this federal admiralty case where maritime law expressly adopts a pure comparative fault system. *See Reliable Transfer*, 421 U.S. at 411. Due to this system, the Court will proportionally reduce Plaintiff's damages according to his percentage of negligence. Consumers cannot be relieved of liability simply because Plaintiff also engaged in negligent acts.

### 3. Damages

It is undisputed that Plaintiff has suffered significant injuries as a result of the sailboat accident. The photographs of his injuries and the testimony of numerous witnesses establishes that Plaintiff suffered, and continues to suffer, extreme physical and emotional injuries. Therefore, Plaintiff has met his burden by a preponderance of the evidence and

proven all four elements of an admiralty negligence claim. A thorough discussion on this Court's calculation of Plaintiff's monetary damages is included below.

### B.  Negligence by Consumers Energy's Subcontractors

Plaintiff also raises a claim of negligence of Consumers Energy's subcontractors (ECF No. 21 at PageID.69). However, at trial, Plaintiff failed to present any evidence regarding Consumers Energy's subcontractors or how they were negligent. Thus, the Court does not find in favor of Plaintiff on this claim.

### C.  Gross Negligence

Third, Plaintiff claims that Consumers Energy's conduct amounted to gross negligence (ECF No. 21 at PageID.69). "Gross negligence in an admiralty case is shown 'where a defendant knows of the risk of harm created by the defendant's conduct or knows facts that make the risk obvious to another in the defendant's situation and disregards that risk.'" *Great Lakes Reinsurance (UK) PLC v. Sunset Habour Marina, Inc.*, No. 10-24469-CIV-JORDAN, 2012 WL 13012738, at *5 (S.D. Fla. Jan. 4, 2012) (citing *Lobegeiger v. Celebrity Cruises, Inc.*, No. 11-21620-CIV, 2011 WL 3703329, at *17 (S.D. Fla. Aug. 23, 2011).

Although Plaintiff presented ample testimony and evidence that Consumers *should have known* of the risk of harm created by the low-hanging powerline over the Lost Channel, the Court finds that Plaintiff failed to present evidence that Consumers did indeed *know* of the risk of harm. Further, while Mr. Mulhearn conceded that he and other Consumers' employees knew that the Lost Channel powerline only had a height clearance of twenty-eight feet, he did not concede that he *knew* of the risk of harm that the powerline created.

Additionally, the Court also finds that the risk was not "obvious to another in the defendant's situation" and Defendant chose to disregard that risk. *See id.* Consumers constructed the Lost Channel powerline in 1940, and Consumers presented testimony that in the powerline's seventy-seven-year history, it had never been involved in a boating accident before Plaintiff's. Plaintiff failed to refute this testimony. Given that the Lost Channel powerline existed for seventy-seven years without incident, the Court finds that the risk of harm of the powerline was not "obvious." As such, Consumers was not grossly negligent in constructing and maintaining the powerline, and the Court does not find in favor of Plaintiff on his gross negligence claim.

### D. Willful and/or Wanton Misconduct

Fourth, Plaintiff claims that Consumers engaged in willful or wanton misconduct (ECF No. 21 at PageID.70). Although the Court was unable to locate a federal admiralty case defining the elements of this claim, Michigan recognizes such a claim:

> The elements necessary to constitute wanton and willful misconduct are: "(1) Knowledge of a situation requiring the exercise of [ordinary] care and diligence to avert injury to another; (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; (3) the omission to use such care and diligence to avert the threatened danger, when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another."

*McLone v. Bean*, 248 N.W. 566, 566 (Mich. 1933) (quoting *Willett v. Smith*, 244 N.W. 246, 247 (Mich. 1932)).

For the same reasons as articulated above in Section III.C, the Court finds that Plaintiff failed to prove that Consumers had the requisite "knowledge" of a situation that required the exercise of ordinary care. Yes, Consumers should have known that the low

clearance height of the Lost Channel powerline could cause serious damage to a sailboat. And yes, Consumers knew of the clearance height of the Lost Channel powerline, but Consumers believed that it was in compliance with multiple standards of care, including but not limited to its own internal standards, NESC standards, and the 1940 Permit. Because Consumers (negligently) believed that its powerline was in compliance with all relevant standards, the Court holds that Consumers did not have the requisite "knowledge of a situation" requiring the exercise of care, beyond the ordinary care that it already believed to be exercising, for its actions to constitute wanton or willful misconduct. Thus, the Court does not find in favor of Plaintiff on his willful/wanton misconduct claim.

### E.  Negligence Per Se

Plaintiff's last claim is that Consumers committed negligence per se (ECF No. 21 at PageID.70) by violating the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403, ("the Rivers & Harbors Act") by constructing a powerline over the Lost Channel that failed to comply with the 1940 Permit, or in the alternative, by constructing a powerline over the Lost Channel without receiving a permit to construct the powerline in this location. Federal maritime law has adopted the traditional elements of negligence per se. *See Rose Crewboat Servs., Inc. v. Wood Res., LLC*, 425 F. Supp. 3d 668, 674 (E.D. La. 2019) (quoting *Mann v. M/V 'Sea Road'*, 417 F.3d 603, 608 (5th Cir. 1969) ("The law is well established that violation of a statute which is intended to protect the class of persons to which a plaintiff belongs against the risk of the type of harm which has in fact occurred is negligence in itself.")). The five elements of negligence per se in admiralty cases are: (1) violation of a statute or regulation, (2) the plaintiff is a member of the class intended to benefit from the

statute, (3) the plaintiff suffered an injury the statute was designed to protect against, (4) the violation was unexcused, and (5) causation. *See Pettis v. Bosarge Diving, Inc.*, 751 F. Supp. 2d 1222, 1238-39 (S.D. Ala. 2010). Here, only the first element—whether Consumers violated a statute—is at issue.

Ms. Cooke testified extensively about the Rivers & Harbors Act[14] and explained that it requires entities to obtain a permit from the Corps before constructing an obstruction over a navigable waterway of the United States.[15] Pursuant to this statute, before Consumers constructed the powerline over the Grand River and the Lost Channel, it was required to obtain a permit. It is undisputed that Consumers did indeed obtain a permit in 1940 to construct the powerline over the Grand River. Specifically, the 1940 Permit authorized Consumers to "construct an aerial electrical transmission line, across [the] Grand River" near Spring Lake, Michigan with a clearance height of eighty feet (*Trial Exhibit D*; ECF No. 68-10). Mr. Mulhearn agreed that the 1940 Permit required at least an eighty-foot clearance over the Grand River.

---

[14] Specifically, the text of the Rivers & Harbors Act reads:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403.

[15] For the reasons stated above in the Findings of Fact, the Court affirms that the Lost Channel, a part of the Grand River, is a navigable waterway of the United States.

Given the Rivers & Harbors Act and the 1940 Permit, Plaintiff then argues two theories of liability under negligence per se. He first argues that Consumers failed to comply with the 1940 Permit, and in turn, the Rivers & Harbors Act, by constructing a powerline over a portion of the Grand River that had a clearance height lower than eighty feet. Alternatively, he argues that if the 1940 Permit was not intended to cover the Lost Channel, then Consumers violated the Rivers & Harbors Act by failing to obtain a permit before constructing an obstruction over a navigable waterway. Therefore, regardless of whether the 1940 Permit did or did not cover the Lost Channel, Consumers violated the Rivers & Harbors Act by constructing the twenty-eight-foot tall Lost Channel powerline.

The Court is persuaded by Plaintiff's first theory of liability and need not reach Plaintiff's second theory of liability. Ms. Cooke testified, and the Court agrees, that the 1940 Permit necessarily governed the Lost Channel. Until the Lost Channel was named as such in 1984, the channel was simply considered a channel of the Grand River. In other words, in 1940, when Consumers applied for and received its permit, Ms. Cooke testified that the Lost Channel "was just the Grand River."[16] And considering the 1940 Permit required the powerline to have a clearance height of eighty feet over the Grand River, Consumers clearly violated the permit's requirements by constructing and maintaining the powerline with a clearance height of twenty-eight feet where it crosses the Lost Channel.[17] By failing to comply

---

[16] Mr. Taylor confirmed that the Lost Channel is a navigable waterway of the United States because it eventually flows into the ocean.

[17] Consumers also likely violated two other express provisions in the permit. The 1940 Permit also required that "there shall be no unreasonable interference with navigation by the work herein authorized," and that "no attempt shall be made by the permitee or owner to forbid the full and free use by the public of all navigable waterways at or adjacent to the work or structure" (*Trial Exhibit D*). But because Consumers clearly violated the eighty-foot clearance requirement, the Court need not reach a conclusion as to whether Consumers also violated these additional provisions.

with the 1940 Permit's requirements, the Court holds that Consumers violated the Rivers & Harbors Act.

This statutory violation "constitutes negligence per se and triggers application of *the Pennsylvania* Rule." *In re Lasala*, 569 F. Supp. 3d 364, 391 (E.D. La 2021). Because the Court finds that Plaintiff has proved that Consumers violated a statute designed to prevent collisions with obstructions over navigable waterways—the type of collision that occurred in this matter—the burden shifts to Consumers to prove "not merely that [its] fault might not have been one of the causes, or that it probably was not, but that it could not have been." *The Pennsylvania*, 86 U.S. at 136.

Consumers has not met this heavy burden. The only defense that Consumers has provided to Plaintiff's negligence per se theory of liability is that the Lost Channel was not a navigable waterway in 1940 and thus, that it needed not obtain a permit to construct the powerline over the Lost Channel. The Court has already concluded that the Lost Channel is, and has been since at least 1870, a navigable waterway; this defense is without merit. Without this defense, Consumers has provided no evidence refuting Plaintiff's negligence per se claim or any argument that *The Pennsylvania* rule is inapplicable. In fact, Consumers failed to attempt to carry its burden under *The Pennsylvania* rule. Consumers never provided evidence "that it could not have been" the cause of Plaintiff's accident. *See id.* at 136. The Court finds that under the rule of *The Pennsylvania*, Consumers failed to prove that it was not one of the causes of Plaintiff's accident. Accordingly, the Court finds in favor of Plaintiff on his negligence per se claim.

## IV.    Conclusion

### A. Apportionment of Liability

"[I]n maritime tort cases where more than one party is responsible, courts apportion liability on the basis of fault according to the rules of comparative negligence." *Daigle v. L & L Marine Transp. Co.*, 322 F. Supp. 2d 717, 732 (E.D. La. 2004) (citing *Reliable Transfer*, 421 U.S. at 411)). In apportioning liability, courts must "weigh the relative degree of fault" between the at-fault parties and determine "what part of total fault shall be apportioned to each by way of a percentage or fault for each." *Delmarine*, 520 F. Supp. 2d at 430. Finally, "[i]n making that determination, the Court will consider the duties owed by each of these parties and the question of whether the conduct of that party deviated from the duty that he owed, and weigh the relative degree of fault of each, expressed as a percentage of the total fault" of both at-fault parties. *Id.*

After reviewing the evidence and the entire record, the Court holds that Consumers is substantially responsible for Plaintiff's injuries. It constructed and maintained a low-hanging powerline where it was reasonably foreseeable that sailboats would sail underneath the powerline. Consumers failed to adhere to its duties under the NESC or its own internal standards, and it completely failed to warn boaters of the public of the Lost Channel powerline's presence or low clearance height. These negligent acts proximately caused and substantially contributed to Plaintiff's physical and mental injuries.

But Plaintiff is not without fault. Plaintiff sailed down an unfamiliar portion of the Lost Channel at dusk, and he failed to inspect the conditions above him or look up to ensure that his mast would not hit any overhead obstructions. He knew that there was a powerline

over the Lost Channel, but he assumed that it had a ninety-foot clearance height, and he proceeded to sail down the channel based on this assumption.

Given both parties' responsibility, the Court apportions the liability as follows:

Percentage of total fault apportioned to Defendant Consumers Energy: 70%

Percentage of total fault apportioned to Plaintiff Michael Saunders: 30%

## B. Damages

Plaintiff requests damages "to adequately compensate the Plaintiff for past, present, future economic damages, past and future medical expenses; past, present, and future non-pecuniary damages, inclusive of pain and suffering, mental anguish, emotional and physical injuries, fear of cancer, increased risk of cancer, disfigurement, permanent scarring, and all other compensable damages contemplated by law; and interest, including prejudgment interest" (ECF No. 118 at PageID.2383-84).

### 1. Past and Future Lost Wages

As explained above in Section II.A regarding Consumers Energy's motion for judgment on partial findings that Plaintiff is not entitled to recover damages for past and future wage losses, the Court declines to award the value of past and future wage losses. For these damages, Plaintiff has "the burden of establishing damages for past and future lost earnings with reasonable certainty, focusing in part on [his] earning capacity both before and after the injury." *Delmarine*, 520 F. Supp. 2d at 444. Specifically for future lost earnings, "future loss must not be based on a speculative premise." *Id.* at 445.

Plaintiff testified that he lost a portion of his wages for the two and a half months he was recovering from the boating accident. Based on his salary of $85,000 per year plus

46

bonuses, he estimated that he lost about $15,000 in wages. However, Plaintiff provided no documentation to support these numbers. Plaintiff's testimony, on its own, is not enough to prove with reasonable certainty that Plaintiff lost $15,000 in past wages due to the accident. *See id.* at 444-45 (holding that the plaintiff's tax returns and speculative calculations did not establish, with reasonable certainty, the plaintiff's claim for past lost earnings); *see also Daigle*, 322 F. Supp. 2d at 731 (awarding the plaintiff past lost earnings based on specific calculations).

As for Plaintiff's request for future lost earnings, Plaintiff provided no testimony that his earning capacity has been diminished as a result of his boating accident. Although Plaintiff is conscious about his skin graft, Plaintiff has returned to work, and he did not testify that he is earning less in wages than he did before the accident. Moreover, although Plaintiff's responsibilities at work may no longer include labor-intense jobs, there is no evidence in the record to support a conclusion that Plaintiff's future wages will be affected by this change in responsibility. "The Court finds that the award of [future earnings] damages would be based on speculative premises, and, therefore, no such damages are awarded." *Delmarine*, 520 F. Supp. 2d at 446.

### 2.  Past and Future Pain and Suffering

Plaintiff has unquestionably suffered extensive pain as a result of the collision with the Lost Channel powerline. The photos of Plaintiff's physical injuries immediately after the accident speak for themselves (*see Trial Exhibits 5A, 5B, 5C, 5D, 5E, 5F*). Even after Plaintiff underwent the skin graft procedure, his arm and hand endured an extensive healing process (*see Trial Exhibit 15*). Plaintiff's physical injuries were gruesome. The Court accepts

47

Plaintiff's testimony regarding the extreme pain he suffered from his burns, changing his bandages, and the numerous medical procedures associated with his treatment. As for Plaintiff's past mental injuries, the Court accepts Plaintiff and R.G.'s testimony regarding Plaintiff's change in demeanor following the accident. Dr. Sewick diagnosed Plaintiff with PTSD, depression, and anxiety stemming from the accident, and the Court finds that Plaintiff suffered severe mental injuries during his healing process.

Further, the Court believes that Plaintiff's pain is not over. Plaintiff is still suffering, and will continue to suffer, from both his physical and mental injuries. Dr. Sewick testified that Plaintiff's mental disorders from the event are chronic, and Dr. Steven Newman testified that many issues resulting from his burns and skin graft—including sweating, sensitivity, and scarring—are likely permanent.[18] Based on the testimony of Plaintiff, R.G., and multiple doctors, the Court is convinced that Plaintiff will suffer permanent mental and physical injuries as a result of his boating accident.

The Court awards Plaintiff $175,000 for past pain and suffering, and $175,000 for future pain and suffering, for a total of $350,000.[19]

### 3. Past Medical Expenses

Plaintiff estimates that his medical expenses stemming from the boating accident equate to about $60,000 (*see* ECF No. 118 at PageID.2383). At trial, Plaintiff testified that he believed his out-of-pocket medical costs were about $10,000. To determine the amount

---

[18] See *Trial Exhibit 27* for Dr. Newman's full report, which the Court accepts as a comprehensive summarization of Plaintiffs' injuries.

[19] *See Delmarine*, 520 F. Supp. 2d at 442-43 (awarding the plaintiff $1,250,000 for past and future pain and suffering damages); *Daigle*, 322 F. Supp. 2d at 733 (awarding the plaintiff $300,000 for past and future pain and suffering damages); *Baham v. Nabors Drilling USA, LP*, 721 F. Supp. 2d 499, 520 (awarding the plaintiff $250,000 for past and future pain and suffering).

of Plaintiff's damages from medical expenses, the Court admitted three billing statements from medical providers: Butterworth Hospital (*Trial Exhibit 7*), John Stafford and Associates (*Trial Exhibit 9*), and North Ottawa Community Hospital (*Trial Exhibit 12*). Plaintiff filed these records as ECF Nos. 131, 132, and 133. Upon the Court's review, Plaintiff's medical expenses from Butterworth Hospital totaled $7,727.80, and his expenses from North Ottawa Community Hospital totaled $3,428.50. The Court will award Plaintiff these purported damages for a total of $11,156.30.[20]

Following the close of evidence, the Court learned that Plaintiff had failed to move to admit the billing statements from U of M. Although the Court admitted Defense Exhibit KKK, medical records from U of M, neither party moved for the admission of—nor did any witness identify—Defense Exhibit JJJ, the billing records from U of M. Upon this discovery, the Court sought clarification from the parties as to their perception of the status of the admission of Defense Exhibit JJJ, and whether any billing statements from U of M had been admitted at trial (*see* ECF No. 138). Plaintiff responded that he intended to move to admit, the Court believed it admitted, billing records from U of M (*see* ECF No. 139). Plaintiff believed that the billing records were included in Exhibit KKK, which is what he represented to the Court, and thus, the Court should find that the billing records (contained in Exhibit JJJ) were indeed admitted. Contrarily, Defendant asserts that Exhibit JJJ was never admitted, and thus, the billing statements from U of M are not contained in the record (*see* ECF No. 140).

---

[20] The provided billing statement from John Stafford and Associates shows expenses that predate Plaintiff's boating accident (*see* ECF No. 132). The Court declines to include these expenses in Plaintiff's damages.

The Court agrees with Defendant that the billing records from U of M are not in the record. Although Plaintiff believed these records were admitted via Exhibit KKK, he was mistaken. This error is Plaintiff's counsel's fault. Plaintiff's counsel should have known what information each proposed exhibit contained, and they should have known that the U of M billing records were not contained in Exhibit KKK.

Yet, the Court finds that it is unfair to penalize Plaintiff for the errors of his counsel. In the interest of justice, the Court will award Plaintiff the cost of his medical expenses from U of M, but only if Plaintiff's insurance company—who presumably paid the cost of his medical expenses—has filed a lien against Plaintiff, should he prevail in this lawsuit. Because Consumers included the U of M billing statements in its list of proposed exhibits (*see* ECF No. 117 at PageID.2344), and because Plaintiff put Consumers on notice that it may rely on any exhibits disclosed by Consumers (*Id.* at PageID.2341), the Court finds that there is no unfair surprise or prejudice to Defendant to award Plaintiff a portion of his medical expenses incurred at U of M. Accordingly, the Court will award Plaintiff the value of any lien against him, arising out of the boating accident, filed by his insurance company.

### 4. Future Medical Expenses

The Court has no doubt that Plaintiff will need further treatment for his injuries. Dr. Newman testified that he, and doctors at U of M, recommend that Plaintiff have laser surgery on his skin graft in the future to reduce the pain and itching associated with the graft (*see Trial Exhibit 27*). Plaintiff indicated that he would like to have this laser cosmetic surgery, but he has yet to undergo the procedure due to financial constraints and because his surgeon has left the state (*see also Trial Exhibit KKK* at 576) (noting that Plaintiff expressed interest

50

in laser procedures to address pruritus, pain, and tightness in the skin graft area). Had Plaintiff provided evidence of the cost of this procedure, the Court would have awarded Plaintiff the approximate cost of this surgery as a future medical expense. However, Plaintiff provided no testimony nor documentary evidence as to the cost of this procedure, so the Court is unable to award Plaintiff the cost of any future medical expenses.[21]

### 5.  Prejudgment Interest

"In admiralty, the court has the discretion to award pre-judgment interest." *Daigle*, 322 F. Supp. 2d at 732. The general rule in maritime law is that "prejudgment interest should be awarded in maritime collision cases, subject to a limited exception for 'peculiar' or 'exceptional' circumstances." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995). In the Sixth Circuit, courts will award prejudgment interest in admiralty cases as long as the three conditions enumerated in *Alkmeon Naviera, S.A. v. M/V Marina L*, 633 F.2d 789 (9th Cir. 1980) are not present. *See Anderson v. Whittaker Corp.*, 894 F.2d 804, 809 (6th Cir. 1990). These three conditions are: when the prevailing party "(1) caused undue delay, (2) claimed damages greater than actual loss and suffered no deprivation of use, or (3) made a bad faith claim." *Id.* (citing *Alkmeon Naviera*, 633 F.2d at 789). Moreover, although other circuits may decline to award prejudgment interest for personal injuries, *see*

---

[21] Had the approximate cost of this surgery been beyond reasonable controversy, the Court simply would have taken judicial notice of the cost. However, Internet sources indicate that the cost of cosmetic laser surgery varies depending on the size of the scar and extent of the treatment. *See, e.g.*, Valencia Higuera, *Laser Treatment for Scars: What You Should Know*, Healthline, https://www.healthline.com/health/laser-treatment-for-scars (last updated July 24, 2018); *How Much Does Laser Skin Resurfacing Cost?*, Am. Soc'y of Plastic Surgeons, https://www.plasticsurgery.org/cosmetic-procedures/laser-skin-resurfacing/cost (last visited July 15, 2022). Unfortunately for Plaintiff, the cost of the surgery is not an appropriate fact to take judicial notice of. *See Brown v. Piper*, 91 U.S. 37, 42 (1875) ("Courts will take notice of whatever is generally known within the limits of their jurisdiction . . . This power is to be exercised by courts with caution. Care must be taken that the requisite notoriety exists. Every reasonable doubt upon the subject should be resolved promptly in the negative.").

*Delmarine*, 510 F. Supp. 2d at 446, in the Sixth circuit, "prejudgment interest is available in a general maritime claim for personal injury or death." *Anderson*, 894 F.2d at 809.

The Court finds that none of the three *Alkmeon Naviera* factors exist in this litigation.[22] Therefore, in accordance with this circuit's precedent, the Court will award prejudgment interest from the date of Plaintiff's accident, September 19, 2017, until the date paid, at a rate of 3.02% on his damages that have actually accrued. *See Martin v. Walk, Haydel & Assocs., Inc.*, 794 F.2d 209, 212 (5th Cir. 1986). Although 28 U.S.C. § 1961 governs the award of post-judgment interest in federal litigation, there is no comparable legislation for prejudgment interest. *See City of Milwaukee*, 515 U.S. at 194. However,

> there is a judicially-fashioned admiralty rule governing the rate of prejudgment interest. In 1982, Congress amended 28 U.S.C. § 1961 to provide that district courts must set the interest accrued after civil judgment by reference to fifty-two week U.S. Treasury bill rates. We have determined that the measure of interest rates prescribed for postjudgment interest in 28 U.S.C. § 1961(a) is also appropriate for fixing the rate for prejudgment interest unless the equities of a particular case demand a different rate. *See Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984).

*Columbia Brick Works, Inc, v. Royal Ins. Co. of Am.*, 768 F.2d 1066, 1071 (9th Cir. 1985).

Therefore, the prejudgment interest rate of 3.02%[23] on Plaintiff's past damages is applicable pursuant to § 1961(a).[24]

---

[22] The Court also notes that mutual fault is not an appropriate reason to deny prejudgment interest in admiralty cases. *See Anderson*, 894 F.2d at 810 (citing *Alkmeon Naviera*, 633 F.2d at 798 n.12) ("[U]nder any rule allowing apportionment of liability, denying prejudgment interest on the basis of mutual fault would seem to penalize the party twice for the same mistake.").

[23] *See Selected Interest Rates (Daily)*, Board of Governors of the Fed. Res. Sys. (https://www.federalreserve.gov/releases/h15/) (last visited July 19, 2022). For the calendar week preceding the date of the judgment, the average one-year constant maturity Treasury yield was 3.016%. *Id.* (showing that the one-year constant maturity Treasury yields were 2.97 on July 11, 3.07 on July 12, 3.21 on July 13, 3.16 on July 14, and 3.12 on July 15, for an average of 3.106).

[24] 28 U.S.C. § 1961 states:

6.  **Total Damages**

The Court finds that Plaintiff's total damages amount to $361,156.30, plus the value of any lien filed against Plaintiff from his insurance company. This figure must be reduced proportionally by Plaintiff's percentage of fault. Accordingly, the Court awards Plaintiff $252,809.41 in damages, plus the value of any relevant liens reduced proportionally, plus prejudgment interest on past damages.

An appropriate order and judgment will follow.

Date:  July 19, 2022                                         /s/ Paul L. Maloney
                                                                          Paul L. Maloney
                                                                          United States District Judge

---

Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.